**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. C 09-00862 MHP |
| v. | **MEMORANDUM & ORDER** |
| DONALD DANIELS, MARTIN WILLIAM WASHBURN, TAPANI KOIVUNEN, IRINA REBEGENEAU, and SERGEI VLADIMIROVICH SHKURKIN | Re: Defendants Daniels, Washburn and Shkurkin's Motion to Dismiss Counts 10 and 11 of the Superseding Indictment |
| Defendants. / | |

On August 27, 2009, a grand jury in the Northern District of California returned a nine-count indictment alleging that Donald Daniels ("Daniels"), Martin Washburn ("Washburn"), Tapani Koivunen ("Koivunen") and Irina Rebegeneau ("Rebegeneau") committed and conspired to commit wire fraud, mail fraud and money laundering. On October 1, 2009, the grand jury returned a superseding indictment, which added Sergei Shkurkin ("Shkurkin") as a defendant, and added two counts, Counts 10 and 11, against Daniels, Washburn and Shkurkin, for using and conspiring to use extortionate means to collect or attempt to collect any extension of credit in violation of 18 U.S.C. section 894.[1] Shkurkin had been earlier charged in a separate complaint, filed on September 16, 2009, with violating section 894. The instant motion, filed by Daniels and later joined by Washburn and Shkurkin, seeks the dismissal of Counts 10 and 11. Having considered the parties' submissions and for the reasons discussed below, the court enters the following memorandum and order.

BACKGROUND

I.     The Fraudulent Business Plan

According to the superseding indictment and the complaint filed against Shkurkin, *see* Docket No. 25 (Superseding Indictment); Docket No. 97 (Evangelist Dec.), Exh. A (Complaint), Washburn was the founder and president of an American company, FoodPro International, Inc. ("FoodPro"); Rebegeneau was a project manager/engineer at FoodPro; and Koivunen was the chief executive officer of Global Sierra Management, LLC ("GSM"). In 2003, FoodPro and GSM, along with AS Vahenurme Agro ("ASV"), an Estonian company owned by Finnish partners ("the Finnish partners"), formed Global Sierra Partners, LLC ("GSP"), a Nevada corporation. GSP was created with the intent of opening a state-of-the-art milling and bakery operation in Estonia.

In order to facilitate that plan, GSP sought a loan from the Overseas Private Investment Corporation ("OPIC"), a United States government agency that provides financing, insurance and/or guarantees to American corporations to encourage their participation in foreign business projects. To be eligible for OPIC support, the American corporation, otherwise known as the U.S. Sponsor, must own at least 25% of the overseas project.

GSP entered into an agreement with OPIC whereby OPIC would provide an $8.9 million small business loan to GSP, and the members of GSP would contribute $7.6 million in equity investment to the bakery project. Specifically, FoodPro would provide $3.8 million cash, ASV would provide $700,000 cash and approximately $2 million in property contributions, and GSM would provide $1 million cash. According to their contributions, FoodPro would control 50% of GSP, ASV would control 35.7% and GSM would control 13.76%.

Unbeknownst to OPIC, the members of GSP had devised a scheme whereby they would procure a short-term loan of $4.5 million (the combined contribution for FoodPro and ASV) from two entities controlled by Daniels, Eagle-Jack Group and Treston Industries, so that GSP would appear to possess the financing it had promised OPIC it would procure. Once GSP received the loans from OPIC, GSP would return the money to Daniels, rather than invest it in the bakery.

2

Daniels agreed to provide the short-term loan in exchange for 25% interest, which would ultimately result in a $1.15 million payment from GSP to Daniels.

Between September 23, 2003, and November 11, 2003, seven wire transfers were made from bank accounts in San Francisco controlled by Daniels to bank accounts controlled by GSP. Within two weeks of each transfer, nearly all of the funds were transferred back to accounts controlled by Daniels. In all, 98% of the funds that Daniels originally transferred to GSP were transferred back to accounts controlled by Daniels. Meanwhile, because OPIC believed that GSP had contributed sufficient capital to adequately fund the bakery project, OPIC provided GSP with the entire $8.9 million loan. Although not relevant to the instant motion, GSP also allegedly lied to OPIC about how it was allocating the loan funds, as would be necessary to obfuscate the return of Daniels' loan. Although GSP represented to OPIC that it would use $7.2 million to procure equipment for the bakery business, only $800,000 was actually spent on equipment.

II. The Extortionate Conduct

The extortionate conduct that is the subject of Counts 10 and 11 is only tangentially related to the fraud allegations that form the heart of the superseding indictment. According to the complaint filed against Shkurkin, as early as October 2004, Daniels had become unhappy with the pace at which he was being repaid the $1.15 million he was owed for having made the short-term loan to GSP. Accordingly, Daniels, Washburn and Shkurkin (who was a business associate of Daniels) devised a plan to convince the Finnish partners that Daniels' money came from the Russian mafia and to threaten the Finnish partners with bodily harm unless they quickly paid the remaining $650,000 owed to Daniels.

To effectuate the plan, while within the United States, Daniels asked Arkady Zalan ("Zalan"), a high-level employee at FoodPro, whether he knew anyone in the Russian mafia. Although Zalan did not know anyone in the Russian mafia, he did know and ultimately contacted a man known as "Gennadi," who lived in Israel.

On October 20, 2004, Washburn sent an email to the Finnish partners, which was copied to Shkurkin and Zalan, stating that representatives for the investors, including two Americans

3

(presumably Shkurkin and Daniels) and one Russion (Gennadi), wanted to conduct a face-to-face meeting to address the fulfillment of the loan agreement. In a follow up email sent the next day by Shkurkin to Koivunen (and copied to Washburn, Zalan and the Finnish partners), Shkurkin stated "[y]ou [the Finnish partners] knew exactly what you were getting into. We were very clear. The investors are frankly very concerned and ask that I attend a meeting with you and all of the GS[P] shareholders to insure that nothing is misrepresented and misinterpreted."

On November 15, 2004, a meeting of the GSP Board of Directors took place in a conference room at a hotel in Helsinki, Finland. In attendance were Washburn, Zalan, Koivunen, the Finnish partners, Shkurkin and Gennadi. Prior to the meeting, Daniels had deposited $5,000 into Zalan's Fremont, California, bank account to pay for Gennadi's expenses. Also before the meeting, Zalan, Washburn and Shkurkin crafted a statement for Gennadi to read to the assembled Board.[2]

At the meeting, Gennadi read the previously-prepared statement, which, in effect, explained that if the remaining $650,000 were not paid by GSP to Daniels, it would be collected from GSP and GSP's members by "all means necessary." The Finnish partners described this as a "mafia-style" threat. Gennadi also stated that Daniels' company was located off shore and not subject to the laws of America, Estonia or any other country and that Daniels was entitled to the entire $1.15 million in interest, of which $500,000 had already been paid. In investigatory conversations between the Finnish partners and the FBI conducted in 2009, each of the three partners explained that they felt physically threatened by Gennadi and the statement that he read.

LEGAL STANDARD

I.      Motion to Dismiss

Under Rule 12(b) of the Federal Rules of Criminal Procedure, a party may file a motion to dismiss based on "any defense, objection, or request that the court can determine without a trial of the general issue." Fed. R. Crim. P. 12(b); *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986). In considering a motion to dismiss, the court is limited to the face of the indictment and must accept the facts alleged in the indictment as true. *Winslow v. United States*, 216

4

F.2d 912, 913 (9th Cir. 1955); *United States v. Ruiz-Castro*, 125 F. Supp. 2d 411, 413 (D. Haw. 2000). "An indictment will withstand a motion to dismiss 'if it contains the elements of the charged offense in sufficient detail (1) to enable the defendant to prepare his defense; (2) to ensure him that he is being prosecuted on the basis of facts presented to the grand jury; (3) to enable him to plead double jeopardy; and (4) to inform the court of the alleged facts so that it can determine the sufficiency of the charge.' " *United States v. Rosi*, 27 F.3d 409, 414 (9th Cir. 1994) (quoting *United States v. Berhardt*, 840 F.2d 1441, 1445 (9th Cir. 1988)). A court must decide such a motion before trial "unless it finds good cause to defer a ruling." Fed. R. Crim. P. 12(d); *Shortt Accountancy*, 785 F.2d at 1452 (citing former Fed. R. Crim. P. 12(e)).

DISCUSSION

Daniels, Shkurkin and Washburn's ("the defendants") motion presents a novel question: can 18 U.S.C. section 894 legally reach the use of extortionate means to collect a debt where some preparation for the making of the extortionate threat occurred in the United States, but where the threat itself was made in a foreign country? Defendants argue that applying section 894 under such circumstances constitutes an impermissible extraterritorial application of the extortion statute, i.e. that this court cannot exercise jurisdiction over such conduct. In response, the government contends that this court has jurisdiction over Counts 10 and 11 because some of the overt acts that aided and abetted the delivery of the actual threat took place within this country.

The government's argument for why the court can properly exercise jurisdiction over Counts 10 and 11 is grounded in the theory of territorial jurisdiction, which holds that a court may assert jurisdiction over a matter if the offense, or part of the offense, occurred within the United States. *See United States v. Moncini*, 882 F.2d 401, 403 (9th Cir. 1989). This generalized, albeit applicable, statement regarding jurisdiction raises the question, however, of whether the offense, or part of the offense, in the instant case occurred within the United States. To answer that question, it is necessary to determine what conduct constitutes a violation of section 894.

5

1   The court begins with the statutory language. Section 894 makes it unlawful for anyone to
2   "knowingly participate[] in any way, or conspire[] to do so, in the use of any extortionate means to
3   collect or attempt to collect any extension of credit . . . ." 18 U.S.C. § 894. The statute defines
4   "extortionate means" as "[a]ny means which involves the use, or an express or implicit threat of use,
5   of violence or other criminal means to cause harm to the person, reputation, or property of any
6   person." 18 U.S.C. § 891(7).[3] No part of the statute defines the word "participate" or the phrase
7   "participates in any way." However, by making anyone who "participates in any way" criminally
8   liable—in contrast to simply anyone who uses extortionate means—Congress evinced an intent to
9   reach a broad range of conduct. As the Second Circuit has noted, the "breadth of the language [of
10  section 894] reflects Congress's desire to craft a flexible set of tools for prosecutors to wield with
11  'vigor and imagination.' " *United States v. Scotti*, 47 F.3d 1237, 1244 (2d Cir. 1995). Section 894
12  has been interpreted as forbidding conduct other than the direct use of extortionate means as long as
13  "it is closely interwoven with and facilitates the use of extortionate means." *Id.* For example, the
14  Ninth Circuit has held that even where a defendant was not present when an extortionate threat was
15  delivered, evidence that the defendant "participated in discussions concerning the . . . debt, . . . urged
16  the use of violence and force in collecting the debt, and . . . ultimately benefited [sic] personally
17  from the proceeds of the. . . collection," was sufficient to support a conviction under section 894.
18  *United States v. Bonanno*, 467 F.2d 14, 17 (9th Cir. 1972).

19  Here, the superseding indictment and the complaint filed against Shkurkin make clear that all
20  three of the defendants who filed the instant motion "participate[d] in any way . . . in the use of any
21  extortionate means to collect or attempt to collect any extension of credit" while within the territorial
22  boundaries of the United States. Daniels wired $5,000 to a bank account controlled by Zalan with
23  the intent that Zalan use the funds to finance Gennadi's travel to and accommodations in Helsinki.
24  Moreover, the purpose of the extortion scheme was to threaten the Finnish partners into repaying
25  Daniels' loan to a bank account in the United States. Washburn sent an email from the United States
26  to, among others, the Finnish partners in order to arrange the meeting in Helsinki, with full
27  knowledge that the threat would be delivered at the meeting. Similarly, Shkurkin sent a vaguely

6

threatening email from the United States to, among others, the Finnish partners informing them that he would be attending the Helsinki meeting on behalf of Daniels. Based upon this conduct, standing alone, this court can exercise jurisdiction over Counts 10 and 11.

Defendants, however, contend that the acts engaged in within U.S. territory present an insufficient basis for this court to exercise jurisdiction. In support of this argument, defendants primarily rely upon *United States v. Lopez-Vanegas*, 493 F.3d 1305 (11th Cir. 2007), a case in which drug distribution conspiracy charges against two defendants were dismissed because the conduct that violated that statute had an insufficient nexus to the United States. In *Lopez-Vanegas*, two defendants appealed their convictions for conspiracy to possess with intent to distribute five kilograms or more of a mixture and substance containing cocaine, 18 U.S.C. § 841(a)(1) & (b)(1)(A)(ii). The defendants actively helped to broker a deal between a cocaine lord in Columbia and a Saudi Arabian prince to transport substantial amounts of cocaine by airplane from Caracas, Venezuela to Paris, France. Both defendants were present at multiple meetings held in Miami, Florida, at which the details of the narcotics shipment were discussed. Ultimately, a great deal of cocaine was successfully transported from Venezuela to France. *Id.* at 1307-11. After apprehending the defendants, the United States government charged each defendant with violations of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii). As in the instant case, the government 'relie[d] solely upon the 'domestic conspiratorial conduct' of [the defendants] to support its argument that the district court had jurisdiction, or . . . that a crime was actually committed . . . ." *Id.* at 1309 n.6. The Eleventh Circuit held that "discussion occurring in the United States related to the possession of controlled substances outside of the United States with intent to distribute those substances outside of the United States" was not sufficient to establish criminal liability in the United States. *Id.* at 1311-13. In reaching that conclusion, the court analyzed the statute at issue to determine whether Congress intended for it to apply extraterritorially. The court held that the cocaine distribution statute could be and had been applied extraterritorially, but only when "some other nexus to the United States," such as the intent to possess or distribute the narcotics in the United States, was present. The

7

required nexus was absent on the facts of the case, meaning that no violation of the drug statute had occurred. Accordingly, the court reversed the defendants' convictions.

Beyond the fact that *Lopez-Vanegas* is an out-of-circuit decision not binding upon this court, it is distinguishable on a number of grounds. Firstly, as far as this court can discern, the "domestic conspiratorial conduct" in *Lopez-Vangas* consisted solely of in-person discussions between the members of the conspiracy. None of the acts taken in furtherance of the conspiracy took place within the United States. In the instant case, Daniels, Washburn and Shkurkin, while in the United States, not only held discussions about their plan to threaten the Finnish partners, but also took affirmative steps—transferring money, sending emails and drafting Gennadi's statement—to effectuate the plan. Therefore, in this case, a greater part of the offense occurred within the United States, bolstering the government's territorial justification for jurisdiction. Secondly, although the threat in the instant case was conveyed in a foreign country, the intended effects of the threat—to speed up the repayment of Daniels' loan—were intended to be felt in the United States. The drug distribution conspiracy in *Lopez-Vanegas* was aimed entirely outside of the United States; none of the drugs or the proceeds from the drugs were to be directed into the United States. Thirdly, the narcotics distribution statute at issue in *Lopez-Vanegas* and the use of extortionate means statutes implicated in this case differ in material respects. Whereas 18 U.S.C. section 894 makes it unlawful to "participate[] in any way" in the use of extortionate means, 21 U.S.C. section 841(a)(1) makes it unlawful for "any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." On its face, then, the use of extortionate means statute criminalizes a broader range of conduct than the narcotics laws. This distinction is important, because preparatory or ancillary conduct that might not violate the narcotics statute can contravene the use of extortionate means statute if the finder of fact concludes that the individual "participate[d]" in any way in the making of the threat. The instant case exemplifies this difference. Had the domestic conduct engaged in by Daniels, Washburn and Shkurkin been aimed at consummating a drug deal in Helsinki, under *Lopez-Vanegas*, it may not have been a sufficient basis, standing alone, upon which to predicate substantive criminal liability;

8

none of the individuals would have knowingly or intentionally distributed or dispensed a controlled substance or possessed a controlled substance with the intent to distribute or dispense it. In contrast, the use of extortionate means statute makes it unlawful for any person to "participate[] in any way" in the making of a threat to collect on a loan. There is little question that defendants, while in the United States, "participate[d] in any way" in the use of extortionate means to collect a debt. *See Bonanno*, 467 F.2d at 17. In sum, these differences between *Lopez-Vanegas* and the instant case support a conclusion that the alleged crime committed by defendants took place, at least in part, in United States territory, thereby justifying this court's exercise of jurisdiction over the charges.

As an additional matter, although the government essentially concedes that section 894 has no extraterritorial reach, the legislative history of the extortionate credit statute provides some justification for applying the law to threats made outside of U.S. territory. "[T]o determine whether a given statute has extraterritorial application, [courts] examine (1) the statute's text for any indication that Congress intended it to apply extraterritorially and (2) compliance with principles of international law." *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002).

In 1968, Congress enacted the statutory provisions addressing extortionate credit as Title II of the Consumer Credit Protection Act, Public Law 90-321. Section 201 of the Act, which was signed into law but never codified, sets forth Congress' "Findings and Purpose" in passing Title II. In that section, Congress noted that "[o]rganized crime"—the principal evil at which Title II was aimed—"is interstate and *international* in character." Pub. L. 90-321, § 201(a)(1) (emphasis added). Congress further explained that "[e]xtortionate credit transactions are carried on to a substantial extent in interstate and *foreign* commerce and through the means and instrumentalities of such commerce." *Id.* § 201(a)(3) (emphasis added). Thus, although the codified prohibition on the use of extortionate means does not clearly indicate that it was intended to apply to threats made outside of the United States, the law enacting that provision unambiguously conveyed an intent that international threats, conducted in foreign commerce, fell within the statute's ambit.

That the statute conveys Congress' desire to see the law applied extraterritorially does not end the court's analysis. For even where Congress expresses its unambiguous intent for a criminal

9

statute to apply extraterritorially, courts must determine "whether international law permits the exercise of jurisdiction." *Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir. 1984).

> International law recognizes five general principles whereby a sovereign may exercise this prescriptive jurisdiction: (1) territorial, wherein jurisdiction is based on the place where the offense is committed; (2) national, wherein jurisdiction is based on the nationality or national character of the offender; (3) protective, wherein jurisdiction is based on whether the national interest is injured; (4) universal, which amounts to physical custody of the offender; and (5) passive personal, wherein jurisdiction is based on the nationality or national character of the victim.

*Id.* (quoting *United States v. Smith*, 680 F.2d 255, 257 (1st Cir. 1982) (footnote omitted)). "Extraterritorial application of penal laws may be justified under any one of the five principles of extraterritorial authority." *Id.* (citing *United States v. King*, 552 F.2d 833, 851 (9th Cir. 1976)).

Here, the exercise of jurisdiction is justified pursuant to the territorial and national principles of extraterritoriality. Firstly, as discussed above, while the actual threat in this case was delivered overseas, much of the preparatory work was completed within the United States. Furthermore, the intended effects of the conspiracy—to recover money for Daniels that would be deposited in the United States—would have impacted the United States. Pursuant to the territorial principle of extraterritoriality, courts have frequently held that where a crime is committed outside of the United States, but its effects are felt within the United States, a federal criminal law may apply extraterritorially. *See United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002) ("Under the territorial jurisdiction theory, jurisdiction is appropriate if the acts performed outside the United States produce detrimental effects within the United States."); *United States v. Vasquez-Velasco*, 15 F.3d 833, 841 (9th Cir.1994) ("Our circuit has repeatedly approved extraterritorial application of statutes that prohibit the importation and distribution of controlled substances in the United States because these activities . . . create a detrimental effect in the United States."); *United States v. Leija-Sanchez*, ___ F.3d ____, 2010 WL 1375407 (7th Cir. 2010) (holding that federal racketeering laws were properly applied to murder, even when the last element of the crime occurred extraterritorially when the effect of the crime was intended to be felt in the United States). Secondly, Daniels, Washburn and Shkurkin all appear to be citizens, nationals or residents of the United States and no evidence to the

contrary has been presented. The government therefore has a recognized and valid interest in prosecuting them for misdeeds committed outside of the country.

As a last step, even where Congress intended a federal criminal law to apply outside of the United States and that decision does not violate international law, a court must still determine if the exercise of jurisdiction in a given case is reasonable. *Vasquez-Velasco*, 15 F.3d at 840. The Restatement (Third) of Foreign Relations Law of the United States section 403(2), cited with approval by the Ninth Circuit, *see Vasquez-Velasco*, 15 F.3d at 840 n.6, includes the following non-exhaustive list of factors to be considered in the reasonableness analysis:

> (a) the link of the activity to the territory of the regulating state, i.e., the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;
>
> (b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;
>
> (c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
>
> (d) the existence of justified expectations that might be protected or hurt by the regulation;
>
> (e) the importance of the regulation to the international political, legal, or economic system;
>
> (f) the extent to which the regulation is consistent with the traditions of the international system;
>
> (g) the extent to which another state may have an interest in regulating the activity; and
>
> (h) the likelihood of conflict with regulation by another state.

Restatement (Third) of Foreign Relations Law of the United States § 403(2) (1987). Although there can be no doubt that Finland likely has a strong interest in regulating the conduct at issue in this case, all of the other factors favor finding that the exercise of jurisdiction is reasonable.

11

* * * * *

In sum, for the reasons stated above the court finds that the exercise of jurisdiction over these defendants on Counts 10 and 11 is proper.

CONCLUSION

Accordingly, defendants' motion to dismiss Counts 10 and 11 is DENIED.

IT IS SO ORDERED.

Dated: June 21, 2010

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

12

**ENDNOTES**

1. To be specific, Count 1 charges Daniels, Washburn, Koivunen, Rebegeneau and Shkurkin with conspiracy to commit mail and wire fraud, 18 U.S.C. § 1349; Counts 2 through 4 charge Washburn with wire fraud, 18 U.S.C. § 1343; Counts 5 and 6 charge Daniels with wire fraud; Count 7 charge Daniels, Washburn and Koivunen with conspiracy to commit money laundering, 18 U.S.C. § 1956(h); Counts 8 and 9 charge Daniels, Washburn and Koivunen with money laundering and aiding and abetting, 18 U.S.C. §§ 1956(a)(2)(A) and 2; Count 10 charges Daniels, Washburn and Shkurkin with conpiracy to collect extensions of credit by extortionate means, 18 U.S.C. § 894; and Count 11 charges Daniels, Washburn and Shkurkin with use of extortionate means to collect extensions of credit, 18 U.S.C. § 894.

2. It is not entirely clear where the individuals were located when they wrote the statement. The government insinuates in its moving papers and indicated at the hearing that they were all located in the United States at the time.

3. The pattern jury instructions essentially parrot the statute's language, providing that a violation of section 894 has two elements: (1) the defendant "knowingly used or participated in the use of extortionate means to collect an extension of credit or loan" from an individual; and (2) "[i]n doing so, [the] defendant expressly or implicitly threatened the use of violence or other criminal means to cause harm to the person, reputation or property of any person." Kevin F. O'Malley *et al.*, 2 *Federal Jury Practice and Instructions* § 37:08 (6th ed. 2008).