1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   MIRANDA KANE (CABN 150630)
3  Chief, Criminal Division

4  ANDREW P. CAPUTO (CABN 203655)
   CHRISTINE Y. WONG (NYBN 3988607)
5  Assistant United States Attorneys
        450 Golden Gate Ave., Box 36055
6       San Francisco, California 94102
        Telephone:  (415) 436-7200
7       Fax: (415) 436-7234
        E-Mail: andrew.caputo@usdoj.gov
8
   Attorneys for Plaintiff
9

10                      UNITED STATES DISTRICT COURT

11                     NORTHERN DISTRICT OF CALIFORNIA

12                         SAN FRANCISCO DIVISION

13

14
   UNITED STATES OF AMERICA,          )      No. CR 09-0862 MHP
15                                     )
            Plaintiff,                 )      UNITED STATES'S REPLY
16                                     )      MEMORANDUM RE: SENTENCING
       v.                              )
17                                     )      Date: June 14, 2011
   DONALD DANIELS, et al.,             )      Time: 2:30 p.m.
18                                     )
            Defendants.                )
19 _____)

20

21         The Government respectfully submits this reply memorandum to rebut issues raised by

22  the defendants' sentencing memoranda.  Specifically, the Government seeks to address the

23  following arguments raised by defendants: 1.  the valuation of the assets at the time of

24  repossession; 2. the outcome of the bakery/milling operation; 3. whether OPIC properly issued

25  the loan; 4. whether white collar defendants should be given lesser sentences; and 5. the roles of

26  the individual defendants.

27         **A.     The value of the assets at the time of repossession is not $4.75 million.**

28         The parties agree that loss for the purposes of restitution is the victim's loss "less the

value (as of the date the property is returned) of any part of the property that is returned.  18 U.S.C. Section 3663A.  The question is what is the proper valuation of the "property," namely the unfinished, milling and bakery operation in Estonia.  Defendants claim that the value is $4.75 million, based on the proposed sale of the operation by OPIC to defendant Koivunen.  This is not a proper basis for valuation.  As defendants must concede, OPIC's goal in negotiating the deal with Koivunen was to obtain the highest value it possibly could in order to recover as much of its loss as it could.  Thus, OPIC accepted an offer to sell the operation for $4.75 million.  However, the deal was never completed because Koivunen could not obtain financing to purchase the operation.  See Koivunen Sentencing Memorandum at 13-14.  In other words, no neutral third-party was willing to support paying $4.75 million for an unfinished, milling and bakery operation in Estonia–demonstrating how unreasonable that offer number was.  Indeed, as Koivunen admits, he ended up negotiating the sale of the bakery for $500,000, approximately $200,000 to be paid up front with the balance paid in installments, and negotiating the sale of the mill for $1.15 million.  The milling and bakery operation had no other buyers; OPIC had no choice but to accept what Koivunen and his partners were able to pay.  Indeed, Koivunen only made the $200,000 payment on the bakery, and two installments totaling approximately $36,000.  See Declaration of Ove Westerheim, at ¶ 1(b).

Allowing the defendants to set the value of the operation at $4.75 million unfairly penalizes OPIC for trying to maximize its recovery, and allows the defendants to continue inflating the value of the milling and bakery operation.  There is no better indicator of the true value of the operation than what the market actually paid, that is, $1,293,204.66, the amount that OPIC was able to recover from the sale of the assets.  See Westerheim Declaration at ¶ 1(b).

**B.     Project status**

Defendants suggest that the project of building the bakery and milling operation progressed on schedule and as planned.  See Daniels' Sentencing Memorandum at 10.  This is simply untrue.  As an initial matter, the purchase of the Valga bakery in 2004 was a deviation from the plan submitted to OPIC and not approved by OPIC, as required.  Once OPIC learned of the purchase, it had to scramble to secure its interest in this property.  Despite representations

1    that the state-of-the-art bakery equipment--allegedly ordered by GSP and allegedly paid for with

2    $3.2 million of the OPIC loan–had been installed, Ove Westerheim observed that "[t]he

3    equipment . . . appeared to be older, Soviet-era equipment."  Indeed, OPIC's local Estonian

4    counsel, Sorainen, confirmed that when GSP purchased the bakery, it also obtained the

5    equipment that was valued at the time of the sale at about $246,000, including $44,000 of VAT.

6    See Gov't's Sentencing Memorandum re Daniels ("Gov't's Sentencing Memo"), Exhibit 12 at

7    DOJ006371.  Finally, at the time that OPIC repossessed the milling/bakery operation in June

8    2005, work on the operation was incomplete.  Once it had repossessed the building, it was

9    responsible for payments to the contractors to complete the work; otherwise, it would have been

10   burdened with an unfinished milling operation–a truly worthless asset.  As a result, OPIC paid

11   the contractors approximately $650,000 to complete the building.  See Westerheim Decl. at ¶

12   1(c).  In short, for its trouble, OPIC did not obtain a shiny, new, functional milling and bakery

13   operation.  Far from it, as discussed above, it was saddled with an asset that no one would buy,

14   and received pennies on the dollar for it.

15          **C.     OPIC's loan rating has no bearing on sentencing.**

16          Defendants suggest that sentencing should be affected somehow because OPIC classified

17   the loan as "high risk" and allegedly had "little hope of repayment."  See Daniels' Sentencing

18   Memo at 9.  Whether or not the GSP loan was "high risk" has nothing to do with whether the

19   defendants lied to OPIC, and certainly does not excuse the blatant misrepresentations that

20   defendants made to OPIC.  Indeed, defendants had no knowledge at the time of the loan that

21   OPIC rated the loan as "high risk."  The only thing defendants knew was that OPIC was only

22   willing to approve the loan for the amount that it did and make subsequent disbursements if

23   certain conditions had been met, namely, that there was an appropriate investor, that GSP

24   received the cash equity, and that the equipment was worth what was represented.  Defendants

25   knew what they had to do to get the money, and did it.  OPIC's rating of the loan is irrelevant.

26          Even more importantly, it does not follow that OPIC's rating of the loan as "high risk"

27   means that OPIC did not expect to be repaid.  To the contrary, OPIC operates on a self-sustaining

28   basis, at no net cost to American taxpayers.  Because it receives no operational funds from the

federal Treasury, it must operate on a commercial basis. In other words, if it were to make loans with no expectation of repayment, it would quickly find itself going out of business. There is no evidence that OPIC had little hope of repayment from the Golden Sierra loan. Its self-funding operating structure, and the fact that it stepped in aggressively to try to salvage matters once it learned of the Golden Sierra fraud indicates the opposite.

### D.   White collar defendants should not be treated differently.

Daniels claims that incarceration is unnecessary to deter him and other white-collar defendants from committing further crimes. Daniels Sent. Memo. at 13-14. This claim reduces to an argument that white-collar defendants should be treated differently – and more leniently – than other offenders. Basic principles of fairness and equity should cause the Court to reject this troubling, class-based argument. "After studying past sentencing practices, the Sentencing Commission made a considered decision to recommend jail time in more white-collar cases in order to equalize the treatment of white-collar crimes with comparable offenses, such as theft." Andrew Weissmann & Joshua A. Block, White-Collar Defendants and White-Collar Crimes, 116 Yale L.J. Pocket Part 286, 289 (2007). Then-Judge Stephen Breyer, writing shortly after the sentencing guidelines went into effect, noted the "inequities" of pre-Guidelines sentencing discrepancies between white-collar crimes and analogous common law crimes. Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest, 17 Hofstra L. Rev. 1, 20-21 (1988). The Court should reject Daniels' argument that his crime somehow warrants a lesser sentence than a crime committed by a blue-collar defendant who lacked Daniels' financial resources or professional reputation within the business community. If anything, because of Daniels' educational background and financial means, Daniels' crime was more serious and warrants a more substantial response than an analogous crime, such as a theft, committed by a less-educated and less-wealthy defendant. This is because he had many other options than other, more economically downscale defendants lack. His crime is thus much less understandable, and much harder to excuse, than an analogous crime committed by a non-white

collar defendant.  He certainly does not warrant a lesser sentence because of his status as a white-collar defendant.

### E.   Limited role

#### 1.   Daniels

The characterization of Daniels' participation of the fraud in his sentencing memorandum suggests that he had some limited role in the fraud.  To the contrary, Daniels had a critical role--Daniels' alleged equity contribution to GSP is the reason that OPIC agreed to approve the loan.  The Government is not claiming that Daniels' cycling of the $950,000 constitutes "any deeper fraudulent intent," but rather highlights just how knowing Daniels' fraudulent acts were.  As Daniels admits in his sentencing memorandum, he never had $3.8 million, or anywhere close to that.  All he had was $950,000 that he manipulated to give the appearance that FoodPro had $3.8 million to contribute and that ASV had nearly $700,000.  In exchange, Daniels was to receive over $1 million.

Daniels tries to justify this exorbitant rate of return by claiming that he was "placing his money at high risk."  Daniels' Memo at 8.  This is simply untrue.  Daniels' money never left friendly hands.  As the Exhibit 7 to the Government's Sentencing Memorandum shows, for nearly every cycle, Daniels' money went to GSP, then went to Farmers Financial, a company with whom both Daniels and Washburn had a prior relationship, then back to Daniels.  On one occasion, the money first went to Padec, a company affiliated with FoodPro, before it was returned to Daniels.  Even when the money was at GSP, Daniels was still in control–Daniels was a signatory on GSP's bank account for that very purpose.  Daniels asked for and received this exorbitant rate of return because he could–the project would never have been financed without his role.

As for the extortion charges, the Government did not ask for a plea to that charge because it doesn't affect the Guideline calculation, not because the extortion never existed.  Daniels' characterization of the "time line" of the extortion events is an attempt at revisionist history.  As Washburn's interview with the FBI makes clear, even Washburn recalls that the person who

played the role of the Russian appeared "grizzled" and "told the Finnish investors if they did not pay back the money they would be kneecapped and things like that." Washburn does not describe the "Russian mobster" as "businesslike," as Daniels now claims he intended. See Exhibit 14 at 302-000104. Moreover, Daniels' email asking for a "final approach" and attaching text in which the "Russian" was supposed to state that he would "use whatever methods necessary to receive the monies owed" was dated November 7, 2004, shortly before the meeting occurred. See Exhibit 17 at DOJ017622. If the "business-like approach" had been what Daniels advocated, surely he would not need to tell his conspirators to "[p]lease delete when you are done reviewing." Id.

Under the Mandatory Victims' Restitution Act ("MVRA"), a court must order restitution to the victim of the offense, and the court cannot consider the defendant's economic circumstances. See United States v. Gordon, 393 F.3d 1048, 1053 (9th Cir. 2004) (citing 18 U.S.C. § 3664(f)(1)(A)). Under Section 3664(h), the Court may apportion the total of restitution between the defendants, but the Court is not required to do so. In cases where the defendants' roles are relatively equal, it is proper for the Court to hold the defendants jointly and severally liable for the restitution payments. United States v. Booth, 309 F.3d 566, 576 (9th Cir. 2002). Given Daniels' significant role in the fraud, there is no reason to reduce his portion of restitution. Moreover, in considering the relatively sanguine economic position that Daniels enjoys, the Court should not reduce Daniels' liability. Notwithstanding the vagaries of the real estate market, Daniels is one of the few defendants who owns property, albeit with others, and thus, has a means to pay the restitution amount.[1] To argue that it would be unfair to require Daniels to pay more because he can turns the restitution statute on its head. The MVRA is not concerned with protecting defendants' assets; the "primary and overarching goal of [the MVRA is] to make

---

[1]Daniels' discussion of his assets neglects to mention this critical fact: in addition to the three properties set forth in the plea agreement, Daniels owns one other property with only his business partner, Greg Nunley (the "Tulare Property"). The Tulare Property, itself, has been valued at $1.5 million. Thus, Daniels does, in fact, have additional assets to satisfy the restitution amount.

1    victims of crime whole, to fully compensate these victims for their losses, and to restore these

2    victims to their original state of well-being . . . ." Gordon, 393 F.3d at 1053 (citing United States

3    v. Simmonds, 235 F.3d 826, 831 (3d Cir. 2000)).

4         In order to comply with the singular goal of the MVRA to compensate victims for their

5    losses, and consistent with Daniels' culpability, the Court should order restitution to be jointly

6    and severally liable among all defendants.

7                              **2.     Washburn**

8         Washburn's sentencing memorandum states that Washburn has recently transferred more

9    than one-third of his ownership stake in FoodPro to two other people, one of them his son.

10   Washburn Sent. Memo. at 10.  The Government understands this to mean that Washburn gave

11   his ownership stake to these people, and not sold his stake in exchange for fair market value.  If

12   the Government's understanding is correct, then this is quite a troubling development.  OPIC lost

13   millions of dollars as a result of the defendants' fraud.  Restitution is mandatory pursuant to the

14   MVRA.  See 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii).  The Court is required to order full

15   restitution, without regard to the economic circumstances of the defendant.  Id. at §

16   3663(f)(1)(A).  By transferring assets to other people shortly before he is sentenced, Washburn is

17   making it less likely that OPIC will be able to collect from him the restitution to which it is

18   entitled.  Accordingly, his decision to dissipate important assets prior to sentencing is likely to

19   frustrate, at least in part, the Court's pending restitution order.  It also raises questions about his

20   commitment to righting the wrong for which he purports to accept responsibility.  In fashioning a

21   a reasonable and appropriate sentence, the Court should take into consideration Washburn's

22   attempt to frustrate any restitution ordered by transferring his assets to others.

23                              **3.     Koivunen**

24        Koivunen states that he took part in informing OPIC of the fraud when the investor

25   relationship soured, arguing that he should get some credit for this.  Koivunen tells an incomplete

26   picture.  The information Koivunen provided was that Washburn and Daniels were at fault;

27   Koivunen made no admissions about his own conduct, including the inflated equipment purchase

28

costs.  Likewise when Washburn was questioned about the equipment by Ove Westerheim, he claimed that Koivunen was responsible for the equipment purchases.  No one should get credit for the self-serving, finger-pointing that these defendants engaged in as OPIC started to question the validity of the project.

### 4. Shkurkin

Shkurkin's sentencing memorandum attempts to characterize him simply as the person who made the introductions among the defendants and who conducted marketing research for GSP.  This ignores the plain fact that Shkurkin was supposed to play Daniels' role, but for OPIC's rejection of Shkurkin's investment vehicle, PFDI.  It likewise ignores Shkurkin's role in developing the fraudulent plan from the very beginning, and his presence throughout the project, beyond conducting marketing research.

### CONCLUSION

For the foregoing reasons, the United States respectfully asks the Court to sentence defendants Daniels, Washburn, and Koivunen to 57 months' imprisonment, defendant Shkurkin to 46 months' imprisonment, and all defendants to five years' supervised release, $200 special assessment, and restitution of $6,922,573.83.[2]


DATED: June 10, 2011                    Respectfully submitted,

                                        MELINDA HAAG
                                        United States Attorney


                                        _____/S/_____
                                        ANDREW P. CAPUTO
                                        CHRISTINE Y. WONG
                                        Assistant United States Attorneys

---

[2]The Government's Statement of Restitution requested $6,193,219.50 because documents that OPIC previously provided supported that sum as of October 10, 2006.  OPIC did have to make expenditures related to GSP past that date.  Based on the Westerheim Declaration, the more accurate sum is $6,922,573.83 for losses to date.  Accordingly, the Government seeks $6,922,573.83 in restitution.