RICHARD A. TAMOR
TAMOR & TAMOR
Law Chambers Building
345 Franklin Street, 3rd Floor
San Francisco, CA 94102
Telephone: (415) 655-1969
Facsimile: (415) 887-7658
web: www.TamorLaw.com

Y. PIETARI GROHN
THE LAW OFFICE OF Y. PIETARI GROHN
810 East 8th Street
Davis, CA 95616
Telephone: (650) 918-6018
Facsimile: (650) 716-0861
Web: www.grohnlaw.com

Attorneys for Defendant TAPANI KOIVUNEN

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANIELS, ET AL.,<br><br>Defendants.<br>_____ | Case No.: CR-09-862-MHP<br><br>DEFENDANT TAPANI KOIVUNEN'S SUPPLEMENTAL SENTENCING MEMORANDUM<br><br>Date:   June 15, 2011 (cont.)<br>Time:  10: a.m.<br>Court: Hon. Marilyn Hall Patel |

At or around 2:30 p.m. on June 14, 2011, as the sentencing hearing for the above captioned criminal case was about to begin, the government handed to undersigned counsel three documents: (i) A final statement from Fidelity National

U.S. v. TAPANI KOIVUNEN, CR 09-862-MHP; SUPPLEMENTAL SENTENCING MEMORANDUM     1

Title Company for the sale of the Mr. Koivunen's home at 3432 Koso Street, Davis, California, with a fax date stamp of June 13, 2011, (ii) a FBI 302 for Mary Green of Western Union dated June 14, 2011, and (iii) a FBI 302 for Marja Koivunen, Mr. Koivunen's ex-wife, dated June 14, 2011.

Just minutes before the Court took the bench, Mr. Grohn had stepped out of the court with Mr. Koivunen to show Mr. Koivunen the above documents for the first time and to ask for his input. Yesterday, with little time to digest the documents and prepare a complete response, undersigned counsel attempted to address the government's allegations, but in hindsight was inadequately prepared to do so. After reviewing the three documents in more detail with Mr. Koivunen during the overnight recess, counsel is now better prepared to address the concerns raised by the government.

**I. Mr. Koivunen's proceeds from his home sale were not a windfall as characterized by the government.**

In 2002, Mr. and Mrs. Koivunen purchased a new family home in Davis, California for $484,760. At least partially the result of stress caused by the Golden Sierra project, Mr. and Mrs. Koivunen divorced in December 2007. At that time, they agreed to sell their house and split the proceeds 50/50. However, due to structural defects in the home construction, the home was not put on the market until May 2008 when the developer had fixed the defects. Eighteen months later,

in November 2009, the house sold for $502,000. By this time Mr. Koivunen had already been arrested and was awaiting trial in North County jail.

After deducting closing costs ($27,794.45) from the $502,000 final sale price, the Koivunen's recorded a **net loss** of $10,554.45. Despite the loss, both Mr. and Mrs. Koivunen received $102,150.23 in cash – due to the relatively large amount of equity that had accrued in the house by the time of the sale. Since the Koivunens did not make a profit on the sale of the house, neither Mr. Koivunen nor Mrs. Koivunen reported income from the home sale in their income tax return.

## II. Mr. Koivunen's home sale proceeds were in no way concealed from the government

In September 2009, when Mr. Koivunen was assigned counsel for his arraignment, he was asked about his personal income and assets. At that time, Mr. Koivunen truthfully and honestly notified the Court of his interest in the house he jointly owned with his then ex-wife Marja Koivunen. The house was eventually sold in November 2009. As Mr. Koivunen was incarcerated at the time, Mr. Koivunen's eldest daughter, Laura Koivunen, executed a power of attorney and closed the sale and placed her father's share of the proceeds in a custodial account to be held by her for the benefit of him. The funds from the sale of the home were not hidden from the government, they were never placed in Laura's personal account, and they were not a gift to Laura.

Although the sale freed up cash for Mr. Koivunen, it was not an income event. No reporting of the sale was required to be made to prison staff at North County jail or to the Court at the time of the sale.

A rough breakdown of Mr. Koivunen's use of the cash freed up by the home sale is as follows: $23,000 was used to pay back Mr. Koivunen's personal loans maintained at Virtain Osuuspankki in Finland (the bank required this as a condition for the bank to authorize Mr. Koivunen bail loan), $5,000 was paid to Mr. Koivunen's ex-wife for overdue child support payments (Mr. Koivunen paid his arrears as soon as he had funds available for such payment), $10,000 was provided to Mr. Koivunen's children as tuition and school assistance, $35,000 Mr. Koivunen used for his own living expenses during the last 15 months, and approximately $25,000 was transferred to Mr. Koivunen's online girlfriend as outlined in more detail below.

**III. Mr. Koivunen was the victim of a $24,090 Nigerian internet dating scam.**

The events leading to the transfers of Mr. Koivunen's funds to Italy are a sad testament to Mr. Koivunen's naivete. In December of 2010, a woman who purported to be Ms. Claire Baidele Cole befriended Mr. Koivunen on Facebook.com. The two quickly developed a romantic online relationship and started to spend a significant amount of time each day chatting on instant messenger, emailing, talking on the telephone, and videoconferencing with each

other. Undersigned counsel has reviewed hundreds of pages of emails and internet chats detailing this relationship. It is clear that this whole relationship is a scam.

The completely bogus representations leading to the transfers are as follows: On January 26, 2011, Mr. Koivunen wired $1,400 to Ms. Cole by Western Union so that she could purchase an airline ticket to travel from **Nigeria**, where she was working at the time at an orphanage, to Davis, California to visit Mr. Koivunen. Ms. Cole canceled the trip at the last minute when she found out that her stepmother had become very ill in Rome, Italy. Ms. Cole then told Mr. Koivunen that her stepmother was diagnosed with lung cancer and was in grave need of urgent treatment. On February 11, 2011, Mr. Koivunen lent Ms. Cole $3,500 and on February 22, 2011, Mr. Koivunen lent Ms. Cole $6,100 so that Ms. Cole could pay for her stepmother's cancer treatment. The funds were wired by Western Union to Ms. Cole and her cousin Ms. Flora Cole in Italy, whom Mr. Koivunen had by now befriended.

On March 5, 2011, the stepmother passed away. The following day, Ms. Cole requested an additional short term loan from Mr. Koivunen for 8,760 Euros to help pay for the transport of her stepmother's casket from Italy to the UK and for related funeral expenses. In response to Ms. Cole's request, Mr. Koivunen, on March 11, 2011, wired $7,200 to Ms. Cole and her cousin. Two weeks later, Mr. Koivunen wired $5,890 to Ms. Cole's friends, Ms Claudia Rossi and Ms. Vivian Amanda Green, who had helped pay for the stepmother's funeral expenses and now

needed to have their loans paid back.

The representations by Ms. Cole and her relationship with Mr. Koivunen have all the hallmarks of an internet dating scam intent on defrauding Mr. Koivunen of his money. Any of the following red flags should have made a prudent person, Mr. Koivunen in this case, recognize the scam: (i) shortly after befriending Ms. Cole, Ms. Cole deleted her facebook page, (ii) Ms. Cole requested that Mr. Koivunen transfer money only by Western Union, a money transfer provider known to be used by scammers, (iv) when Mr. Koivunen tried to wire funds by bank wire, the wire was returned, (v) Ms. Cole cancelled her trip to visit Mr. Koivunen at the last minute, (vi) Ms. Cole made excuses for not repaying her loans as agreed via chat, (vii) Ms. Cole at 28 is significantly younger than 53-year-old Mr. Koivunen; and Ms. Cole was initially located in Nigeria (working at an orphanage). A Google search of the words "Nigerian Scam" leads to numerous web pages detailing these embarrassingly similar factual scenarios. *e.g.* http://www.datingnmore.com/fraud/scam_database.htm.

Mr. Koivunen just now recognizes that his relationship with Ms. Cole is a scam. Even today Mr. Koivunen has exchanged emails and telephone calls with Ms. Cole. Over the last six-months the two have exchanged hundreds of emails and have spent upwards of 20 hours a week chatting and talking with each other. Mr. Koivunen believes that he is helping Ms. Cole cope with hard life events. Ms. Cole is aware of Mr. Koivunen's trial and has become some sort of confidant for

him. To counsel's great surprise, Ms. Cole even sent a letter to the court in support of Mr. Koivunen.

Mr. Koivunen's behavior can only be explained by his extreme naiveté and blind trust in the goodness of others. Mr. Koivunen trusts others to such an extent that other people can, and at times do, take advantage of him. In the same way that Mr. Koivunen did not recognize and acknowledge Ms. Cole's scam, Mr. Koivunen was not able to recognize and acknowledge the fraud within Golden Sierra until his Finnish peers pointed it out to him in the summer of 2004.

## Conclusion

To the extent that the prosecutor wishes to imply that Mr. Koivunen was not honest or in some other way hid funds from the government in connection with the sale of his home, such conclusion is not supported by the fact that Mr. Koivunen disclosed his interest in his home when he was first arrested in Chicago in September 2009 and, further by the fact that his home sale did not produce any reportable profits to Mr. Koivunen.

Finally, the prosecutor's submission of records of wire transfers from Mr. Koivunen to Ms. Cole and associates in Europe does not reveal an effort by Mr. Koivunen to dissipate his funds, but a much sadder reality, that Mr. Koivunen's naïveté made him a victim of an Internet scam.

Date: June 15, 2011                    Respectfully Submitted,
                                       TAMOR & TAMOR


_____/s/_____
Richard Tamor, ESQ.
Attorneys for Defendant,
TAPANI KOIVUNEN